# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 9093 | **DATE** | 9/27/2004 |
| **CASE TITLE** | Hamilton vs. Spraying Systems Inc.,et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   ENTER MEMORANDUM OPINION AND ORDER:  Defendants' motion for summary judgment [34-1] is granted in part and denied in part. Plaintiff's motion to strike [56-1] is granted, and Defendants' motion to strike [51-1] is denied.  **STATUS HEARING SET FOR 10/13/04 AT 9:30A.M.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | SEP 28 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 62 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| TBK | courtroom deputy's initials | | | |

2004 SEP 27 AM 11:53
CLERK, U.S. DISTRICT COURT

Date/time received in central Clerk's Office   mailing deputy initials

DOCKETED
SEP 2 8 2004

Delores Hamilton, )
)
Plaintiff, )
)
v. ) Case No. 02 C 9093
)
Spraying Systems, Inc., and ) Hon. Mark Filip
Mario Martinez, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Delores Hamilton ("Plaintiff" or "Hamilton") is suing her former employer,

Defendant Spraying Systems, Inc. ("SSCo.") and a former co-worker, Mario Martinez

("Martinez"). Hamilton alleges that SSCo., in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e *et seq.*, subjected her to less favorable terms and conditions of

employment by denying her on-the-job training based on her race (Count I) and sex (Count II)

and by subjecting her to a hostile work environment because of her sex (Count II). Hamilton

further alleges that SSCo. retaliated against her by denying her overtime and by allowing co-

workers to continue to harass and refuse to provide her with on-the-job training (Count III). She

also claims (Count IV) that SSCo. paid her lower wages than her male counterparts, in violation

of the Equal Pay Act, 29 U.S.C. § 206(d). In addition to these claims against SSCo., she is suing

Defendant Martinez under an Illinois state law assault theory, arising from a work-related

incident (Count V).[1]

---

[1] The preceding characterization of Hamilton's claims is drawn from Hamilton's
Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (*see* D.E. 41
at 2) (the designation "D.E." as used throughout this opinion refers to the docket entry number of
the cited document), which characterization is not inconsistent with the allegations in Hamilton's

62

This case is before the Court on Defendants' Motion for Summary Judgment and Memorandum of Law in Support (D.E. 36), Plaintiff's Motion to Strike Portions of the Defendants' Reply Brief (D.E. 56), and Defendants' Motion to Strike Declarations of Willivory Simpkins and Mariano Capote (D.E. 51). For the following reasons, Defendants' motion for summary judgment is granted in part and denied in part, Plaintiff's motion to strike is granted, and Defendants' motion to strike is denied.

## BACKGROUND

I.  Facts

    A.  The Parties

The parties and individuals relevant to this suit are as follows.[2] Plaintiff Hamilton, an African-American female, was hired by Defendant SSCo. on January 19, 1998 (Pl.'s St. ¶ 1; Defs.' St. ¶ 9), to work in Department 4 (Industrial Accessories) at SSCo.'s manufacturing facility located at North Avenue and Schmale Road in Glendale Heights, Illinois ("Schmale Facility") (Defs.' St. ¶ 9). SSCo. is an international company engaged in the business of designing and manufacturing spray nozzles and related accessories for industry and agriculture. (*Id.* ¶ 1.) Defendant Martinez, a Hispanic male, is currently a Setup/Operator on the first shift in Department 4 at the Schmale Facility; however, prior to working in Department 4, he held the same position in Department 6. (*Id.* ¶ 4.) Non-party John Vaca ("Vaca") is the Center Leader for

Complaint. The Court notes that the parties' summary judgment papers assume that there is also a retaliatory transfer claim at issue in this case. (*See, e.g.*, D.E. 36 at 15-18; D.E. 41 at 15-19.)

[2]    The Defendants' Local Rule 56.1(a) statement of material facts is cited as "Defs.' St. ¶ __." and Plaintiff's Local Rule 56.1(b) statement of additional material facts is cited as "Pl.'s St. ¶ __." The Defendants' and Plaintiff's Local Rule 56.1 responses are cited as "Defs.' Resp. ¶ __" and "Pl.'s Resp. ¶ __," respectively.

Department 4 and Department 6 (Industrial Valves) at the Schmale Facility. (*Id.* ¶ 10.) Vaca, a Hispanic male, hired Hamilton, and he was her direct supervisor throughout her employment with SSCo. (*Id.*) After Vaca hired Hamilton, he informed Hamilton that he would hire her as a permanent employee, promoted her on another occasion, and recommended that she apply for a position (Setup/Operator Trainee) that constituted yet another promotion, which position she also received. (*Id.* ¶¶ 13-14, 17.) Non-party Eugene Whisman ("Whisman"), a white male, is a Setup/Operator in Department 4. (*Id.* ¶ 15.) (The parties stipulated to the dismissal of Vaca and Whisman from this suit with prejudice on June 20, 2003. (D.E. 13.))

      B.      Hamilton's Positions at SSCo.

Over the course of her employment, Hamilton held three different positions at SSCo., eventually being promoted to the position of Setup/Operator Trainee. As noted above, she began her employment as a Temporary Manufacturing Helper, which is a 90–day probationary position, on the first shift in Department 4. (Defs.' St. ¶ 9, 12.) She completed the 90-day probationary period, and SSCo. promoted her to the entry level and permanent position of Assembler/Utility Operator on the first shift of Department 4 on May 11, 1998. (*Id.* ¶ 14.) She was the only African-American female in Department 4. (Pl.'s St. ¶ 30.)[3] On November 6, 2000, SSCo. promoted Hamilton to Setup/Operator Trainee in Department 4 (Defs.' St. ¶ 17), and she was assigned to work primarily on operating, setting up and programming the CNC vertical machines (*id.* ¶ 51). Setup/Operator Trainees set up various manufacturing machines and

---

[3]     SSCo. denies this statement of fact in its Local Rule 56.1 Response; however, the denial is not properly supported. The Court, therefore, deems it admitted for summary judgment purposes. *See* Local Rule 56.1(a) ("All material facts set forth in the statement filed pursuant to section (b)(3)(B) will be deemed admitted unless controverted by the statement of the moving party.")

keep those machines operational. (*Id.* ¶ 50.) On January 7, 2002, Vaca transferred Hamilton from Department 4 to 6. (*Id.* ¶ 67.) (This transfer, as discussed below, relates to Hamilton's retaliation claim.) From the time Hamilton began in Department 6 until April of 2002, her primary job duties were setting up and operating the CNC vertical machines. (*Id.* ¶ 68.)[4] Hamilton remained a Setup/Operator Trainee until October of 2002.[5] (*Id.* ¶ 6.) Hamilton was the only African-American female Setup/Operator Trainee in Departments 4 and 6. (Pl.'s St. ¶ 32.)

### C. Training at SSCo.

SSCo. does not have a formal training policy, program, or system. (Defs.' St. ¶ 40.) Rather, knowledgeable employees are typically available to provide on-the-job training as conditions permit, and on-the-job training is a team concept. (*Id.* ¶ 41.) None of the SSCo.'s employees is solely available to train other employees because all employees work to perform their primary job duties to complete manufacturing jobs. (*Id.*) Given the demand and flow in manufacturing, on-the-job training may not occur on a regular basis. (*Id.*)

The lack of a formal training mechanisms notwithstanding, Hamilton was slated to receive on-the-job training, and she also attended certain training classes. The parties agree that, as discussed below, Whisman was to train Hamilton on the CNC lathe machines (*id.* ¶ 53) while

---

[4]    Hamilton generally denies this statement of fact in her Local Rule 56.1 Response; however, the cited documents do not support her denial. The Court, therefore, deems it admitted for summary judgment purposes. *See* Local Rule 56.1(b).

[5]    On October 8, 2002, Hamilton was involved in a car accident that rendered her unable to return to work. (Defs.' St. ¶¶ 6, 18.) Plaintiff has been on permanent disability since, and she will receive such benefits for approximately the next fifteen years until she is sixty-five years old. (*Id.* ¶ 6.)

she was in Department 4 and that Martinez was to train Hamilton on the CNC lathe machines while she was in Department 6 (*id.* ¶¶ 72-74). In addition to on-the-job training, Hamilton attended at least ten training classes as an Assembler/Utility Operator, including computer classes, blueprint reading classes, and a CNC vertical machine setup/programming class. (*Id.* ¶ 48.) In or around August 2001, Vaca sent Hamilton to a six-week training course called "CNC Turning Center Setup," which taught Hamilton how to set up and program lathe machines. (*Id.* ¶ 54.)

D.    CNC Lathe Machine Training in Department 4

Hamilton contends that she was denied on-the-job CNC lathe machine training by Whisman, a Setup/Operator with twenty years of experience, while she was stationed in Department 4. When Hamilton was working in Department 4, there were two CNC vertical machines and eight lathe machines. (Pl.'s St. ¶ 44.) During the first 90 days of her employment, Donald Johnson, a Setup/Operator, trained (and was the only person to train) Hamilton on how to operate the CNC vertical machines in Department 4. (*Id.* ¶ 49.) At some point, Vaca made the decision to have Hamilton cross-train on the CNC lathe machines. (*Id.* ¶ 56.) Vaca made this decision based on Hamilton's desire to learn more on the CNC lathes, the needs of the Center, and the progression of Hamilton's training. (*Id.*) As part of her training on the lathe machines, Vaca sent Hamilton to a six-week long classroom training course, which course taught Hamilton how to set up and program lathes. (Defs.' St. ¶ 54.) Hamilton successfully completed this course. (*Id.*)

Vaca testified that Whisman was Hamilton's "primary go-to person" on the lathes (Pl.'s St. ¶ 57), and SSCo. acknowledges that Whisman was "primarily responsible for cross-training"

Hamilton on the lathe machines. (D.E. 36 at 5.) But when Hamilton sought CNC lathe machine training from Whisman, Hamilton contends, and SSCo. denies, that Whisman would not answer her training-related questions. (Pl.'s St. ¶ 80.)[6] Instead, according to Plaintiff, Whisman would represent that he did not know the answer, but then fix the problem without showing Hamilton how to do so by herself. (Id.) Hamilton testified that Whisman also spoke down to her and yelled at her. (Id. ¶ 81.)[7] Hamilton complained to Vaca on several occasions that she was not getting adequately trained by Whisman. (Id. ¶ 85.)

E. CNC Lathe Machine Training in Department 6

Hamilton also contends that she was denied on-the-job CNC lathe machine training by Defendant Martinez, a Setup/Operator, while she was stationed in Department 6. On January 7, 2002, Hamilton was officially transferred to the first shift in Department 6. (Id. ¶ 112.) When Hamilton was in Department 6, there was one CNC vertical machine and five CNC lathe machines. (Id. ¶ 115.) Upon her transfer to Department 6, Hamilton was assigned to work on a CNC vertical machine. (Id. ¶ 113.) At some point Vaca spoke with Defendant Martinez and informed Martinez that he would be training Hamilton on the CNC lathe machines. (Id. ¶ 121.) However, at least according to Plaintiff, Martinez refused to train Hamilton on the lathes (id. ¶ 124), and Martinez asked at least one other co-worker not to help Hamilton with the lathe machines (id. ¶¶ 126, 127).

---

[6] SSCo. denies this statement of fact in its Local Rule 56.1 Response; however, the denial is not properly supported. The Court, therefore, deems it admitted for purposes of summary judgment.

[7] SSCo. denies this statement of fact in its Local Rule 56.1 Response; however, the denial is not properly supported. The Court, therefore, deems it admitted for purposes of summary judgment.

F.    The Wasino Machine Incident

According to Hamilton, Martinez's refusal to train her on the lathe machines went so far as to involve an intentional assault against her. On one morning that Hamilton was working in Department 6, Martinez approached Hamilton regarding one of the CNC machines, the Wasino machine, and told her that the machine was "ready to run." (*Id.* ¶ 147.)[8] In order for Martinez to have gotten the machine "ready," he would have had to turn the machine on, warm the machine up, and check the machine's parts. (*Id.* ¶ 148.)[9] Hamilton approached the machine and found that it was already running. (*Id.* ¶ 149.)[10] She began operating the machine, and shortly thereafter it crashed. (*Id.* ¶ 147.) According to Plaintiff, at the time the machine crashed, Martinez was standing right next to her. (*Id.* ¶ 150.) Hamilton essentially argues that Martinez somehow booby-trapped the Wasino machine so that when she was operating it, it would crash and potentially eject sharp parts.

## ANALYSIS

II.    Plaintiff's Motion to Strike Is Granted

The Court begins it analysis by addressing the threshold issue of whether certain portions of Defendants' reply brief should be stricken. In their opening summary judgment brief (which is

---

[8]    Martinez denies this statement of fact in Defendants' Local Rule 56.1 Response; however, the denial is not properly supported. The Court, therefore, deems it admitted for purposes of summary judgment.

[9]    Martinez denies this statement of fact in Defendants' Local Rule 56.1 Response; however, the denial is not properly supported. The Court, therefore, deems it admitted for purposes of summary judgment.

[10]    Martinez denies this statement of fact in Defendants' Local Rule 56.1 Response; however, the denial is not properly supported. The Court, therefore, deems it admitted for purposes of summary judgment.

close to ten pages longer than what is presumptively permitted by Local Rule), Defendants do not argue that SSCo. is entitled to summary judgment on Hamilton's sex-based hostile work environment claim, which is asserted in Count II of Hamilton's Complaint.[11]  Plaintiff noted the absence of such an argument in her response and characterized Defendant's motion as a "partial" motion for summary judgment.  (D.E. 41 at 3.)  Nonetheless, in Section II.B of Defendants' Reply brief, SSCo. argues, for the first time, that it is entitled to summary judgment on this claim.

On April 16, 2004, Hamilton filed a Motion to Strike Portions of Defendants' Reply Brief (D.E. 56), which moved this Court to strike Section II.B of Defendants' Reply in Support of Summary Judgment (D.E. 49).  Hamilton contends that this section "raises a new legal and factual argument that Defendants failed to raise in their" opening summary judgment brief.  (D.E. 56 ¶ 4.)  In response, Defendants argue that "Section II.B of Defendants' Reply contains proper argument made in direct reply to an issue raised by Plaintiff in her Response, and, therefore should not be stricken."  (Defs.' Resp. to Pl.'s Mot. to Strike Portions of Defs.' Reply Br. (D.E. 58) at 4.)

SSCo. offered two different reasons for not including an argument directed at Hamilton's sex-based hostile work environment claim.  First, SSCo. attempted to explain the omission of a sex-based hostile work environment argument in its opening brief with a footnote in its Reply, explaining that its memorandum in support of its motion for summary judgement "did not focus

---

[11]     Judge Gettleman granted Defendants leave to file a brief in excess of fifteen pages (D.E. 33) and an eight-day extension to file their summary judgment motion (D.E. 31)—which suggests that Defendants' arguments, or lack thereof, were not caused by space or time limitations.

on Plaintiff's hostile work environment claim because she failed to put forth any evidence . . . and failed to make even the minimum showing required to sustain a hostile work environment claim." (Defs.' Reply in Supp. of Summ. J. (D.E. 49) at 5 n.4.) This explanation is unavailing. SSCo. elsewhere in its briefs recognizes that, as the moving party, it had the initial burden under Rule 56. (Indeed, Defendants detail the burdens imposed on parties under Rule 56, and argue that Plaintiff has failed to meet her *Celotex* burden.) Second, SSCo., in response to Plaintiff's motion to strike, argued that "Section II.B of Defendants' Reply contains proper argument made in direct reply to an issue raised by Plaintiff in her Response, and, therefore, should not be stricken." (D.E. 58 at 2.) This argument is also unavailing, because SSCo. never argued for summary judgment on this claim in the first instance, as it must.

Because SSCo.'s arguments against Plaintiff's sex-based hostile work environment claim were first raised in SSCo.'s reply brief, the arguments are waived for purposes of the summary judgment motion before the Court. *See, e.g., James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998); *Stein v. United Airlines*, 203 F. Supp. 2d 974, 978 (N.D. Ill. 2002). The Court, therefore, strikes Section II.B of Defendants' Reply. Defendants' failure to include an argument directed at Hamilton's sex-based hostile work environment claim in its opening brief deprived Hamilton of the opportunity to present argument in support of that claim and deprived the Court of the opportunity to consider developed arguments from both sides. Summary judgment is denied on Count II.

III.     Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *accord, e.g.*, *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995).

IV.    Hamilton's Title VII Claims

A.    Failure-to-Train Claim

Hamilton contends that SSCo. did not provide her with on-the-job lathe machine training because she is an African-American female. Hamilton apparently concedes that she has no direct evidence of this type of discrimination, relying on the burden shifting formula established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973). Under this approach, Hamilton must first demonstrate that: (1) she is a member of a protected group; (2) SSCo. provided training to its employees; (3) she was eligible for training; and (4) she was not provided training under circumstances giving rise to an inference of discrimination, i.e., that she was denied training given to other similarly situated employees who were not members of the protected group. *See Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000) (citing *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir.1998)).

SSCo. attacks the fourth element of Hamilton's *prima facie* failure-to-train claim, arguing that she was provided with on-the-job lathe machine training in Departments 4 and 6 and that she cannot show that others who are similarly situated to her received more training than she did.

10

(D.E. 36 at 2, 14-15.) It is undisputed that Hamilton did receive some training on the lathes. But Hamilton essentially contends that she did not receive as much training as non-African-American males. Hamilton "must come forward with specific evidence showing that she was similarly situated to [non-African-American, non-female] employees who received more training." *Pafford*, 148 F.3d at 668.

As best the Court can tell, Hamilton points to three comparators for purposes of her failure-to-train claim: Mariano Capote ("Capote"), Stanley Swacha ("Swacha"), and Jose Ferreyra ("Ferreyra"). (D.E. 41 at 6, 9-10.) To demonstrate that she is similarly situated to these individuals, Hamilton must show that they are "directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (collecting cases). As part of this inquiry, this Court "must look at all relevant factors, the number of which depends on the context of the case." *Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000)). The Court holds that, under the particular facts of this case (which facts frame the context in which she presents her claim and informs the Court as to what is properly considered material), Hamilton has demonstrated that there is a triable issue with respect to whether the comparators that she identifies are similarly situated for purposes of her failure-to-train claim.

The parties' briefing on the similarly-situated analysis is sometimes difficult to follow. Given the apparently unstructured nature of training at SSCo., it is difficult to determine with any degree of precision exactly what on-the-job lathe machine training opportunities Hamilton was allegedly denied and that her comparators received, leaving the Court with only the general proposition that Hamilton was trained "less" than her comparators. (D.E. 41 at 10.) As evidence

11

that she was trained "less," Hamilton points out that Whisman testified that he was training

Ferreyra and Capote at the time he was training Hamilton. (Pl.'s St. ¶ 61.) In addition, Plaintiff

notes that at some point while she was working in Department 4, Vaca stated that she would

begin training on the CNC lathe machines (*id.* ¶ 56), which training SSCo. concedes was to take

place primarily with Whisman (Defs.' St. ¶ 53). According to Plaintiff, Whisman refused to train

her on the set up of the CNC lathe machines when assigned to do so, and he took steps to make

her training more difficult, yet willingly trained Capote and Ferreyra on the lathe machines.

(Pl.'s St. ¶¶ 65, 67, 82, 84-85.) To be sure, as Defendant contends, Plaintiff's testimony on this

score at times is vague, but as non-movant, she gets the benefit of the doubt on reasonable

inferences, and this is enough to create a triable issue. *See Roberts v. Broski*, 186 F.3d 990, 995

(7th Cir. 1999) ("At the summary judgment stage, [a non-movant plaintiff] is of course entitled

to a favorable construction of the facts as well as the benefit of every reasonable inference that

may be drawn from those facts."). This conclusion is reinforced by the fact that Capote testified

that Martinez (who admitted that he was training Swacha, a white male, at the same time he was

supposed to be training Hamilton (Pl.'s St. ¶ 123)), told Capote that he could do him a "big

favor" by not helping Plaintiff when she asked for help (*id.* ¶¶ 126-28; *see also id.* 62-64

(Simpkins's testimony in support of Plaintiff regarding Whisman[12]). To be sure, SSCo. and its

---

[12]    Defendants seek to strike testimony of Willivory Simpkins and Mariano Capote that
Plaintiff offered via affidavit. That request is denied. It is often difficult to evaluate foundational
objections to affiant testimony in the context of summary judgment. However, Capote has
provided sufficient foundation for his testimony that Martinez told him, about a month or two
after Plaintiff was transferred to Department 6, that Capote would be doing Martinez a "big
favor" if Capote would not assist Plaintiff on the machines. Similarly, although it is a closer
question, there is sufficient foundation for Simpkins's testimony, at least for present purposes on
the basis of the summary judgment papers.

witnesses have benign explanations and theories regarding such evidence, but it is sufficient to create a triable case with respect to Hamilton's failure-to-train claim.

B. Hamilton's Retaliation Claims

Count III of Hamilton's amended complaint alleges that SSCo. retaliated against her for complaining of race and gender discrimination by denying her overtime and by refusing to train her. (*See* Compl. ¶¶ 73-75.) As noted above, the parties also argue at length over what is apparently a retaliatory transfer claim, although such a claim is not readily apparent from Hamilton's Complaint. Title VII makes it unlawful for an employer "to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a). SSCo. argues that it is entitled to summary judgment on Hamilton's retaliation claims for several reasons, each of which is discussed in turn below.

The Court begins its retaliation analysis by identifying the respective burdens placed upon the parties as a consequence of Defendants' summary judgment motion. In *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640 (7th Cir. 2002), the Seventh Circuit "clarified the standards for summary judgment on Title VII unlawful retaliation claims." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004). Specifically, *Stone* laid out two ways "for a plaintiff to establish a *prima facie* case for unlawful retaliation to avoid summary judgment in favor of the employer." *Id.* Under the first way, the direct method of proof, the plaintiff may "present direct evidence (evidence that establishes without resort to inference from circumstantial evidence)" that the plaintiff engaged in protected activity and, as a result, suffered an adverse employment action. *Id.* The second way, the indirect method of proof, a plaintiff

13

must establish that, after engaging in protected activity, the plaintiff was subjected to an adverse employment action even though he or she was performing his job satisfactorily and no similarly situated employee who did not engage in protected activity was subjected to the adverse employment action. *Id.* (Hamilton apparently concedes that she has no direct evidence of retaliation, focusing instead on the elements of a *prima facie* case under the indirect method.) Under the indirect method of proof, failure to satisfy any one element of the *prima facie* case is fatal to an employee's retaliation claim. *Id.* at 560. Moreover, and consistent with general principles in employment law, "[e]ven where a plaintiff establishes all of the required elements to make out a prima facie case, if the employer presents unrebutted evidence of a non-invidious reason for the employment action at issue, the employer is entitled to summary judgment unless there is a material issue of fact as to whether the employer's non-invidious reason is pretext for retaliation." *Id.*; *accord, e.g., Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1146 (7th Cir. 1997)

SSCo. argues that Hamilton cannot establish that she engaged in protected activity. Defendants claim that, with respect to her race and gender discrimination claims, Hamilton never made such claims to "Vaca, the [SSCo.] Human Resource Department[,] or anyone else." (D.E. 36 at 16.) Hamilton argues that she did complain "of sex and race discrimination in Department 4 and Department 6." (D.E. 41 at 14.) Specifically, Hamilton points to three letters: a May 13, 2001, letter; a July 4, 2001, letter, and a January 8, 2002 letter, as well as the May 2002 charge that she filed with the EEOC. (*Id.* at 16.)

In its reply, SSCo. responds that, as a threshold matter, Hamilton cannot point to the May 13, 2001, letter or the July 4, 2001, letter as evidence that she complained of discriminatory

conduct because these "incidents" are time-barred under 42 U.S.C. § 2000e-5(e)(1). (D.E. 49 at

15.) Section 2000e-5(e)(1) provides, in relevant part, that an EEOC charge "shall be filed . . .

within three hundred days after the alleged *unlawful employment practice* occurred." 42 U.S.C. §

2000e-(5)(e)(1) (emphasis added). SSCo.'s argument assumes that, for purposes of determining

the alleged "incident" (or, more precisely, "unlawful employment practice") that gives rise to a

Title VII retaliation claim for statute of limitations purposes, the Court should look to the date of

the protected activity rather than the date of the adverse employment action that is purported to

be retaliatory in nature.

       This argument, with all respect to SSCo., is fundamentally flawed. Generally speaking,

and at least on the factual record presently before the Court, a Title VII plaintiff would not know

that he or she has been retaliated against for opposing a practice prohibited by Title VII at the

very moment she submits a complaint regarding the practice or otherwise opposes it. It is not

until the plaintiff has suffered some adverse employment action that "the incident" occurs that

gives rise to a Title VII claim. *See Sharp v. United Airlines*, 236 F.3d 368, 373 (7th Cir. 2001)

("The 300-day limit, we have stated, begins to run when the defendant has taken the action that

injures the plaintiff and when the plaintiff knows she has been injured . . . ."). And, as the

Seventh Circuit has explained, "'[r]etaliation' is shorthand for 'adverse consequence deliberately

attached to the exercise of a right protected by law.'" *O'Rourke v. Cont'l Cas. Co.*, 983 F.2d 94,

97 (7th Cir. 1993). Accordingly, the 300-day statute of limitations for purposes of a Title VII

retaliation claim begins to run from the alleged act of retaliation–i.e., the adverse employment

action, not the alleged protected activity. *See, e.g., O'Neill v. Ind. Com'n of Pub. Records*, 149

F. Supp. 2d 582, 591 (S.D. Ind. 2001) ("Her termination is the adverse action giving rise to her

retaliation claim, and it occurred during the 300 day filing period."); *see also Delaware State College v. Ricks*, 449 U.S. 250, 256 (1980) ("Determining the timeliness of [plaintiff's] EEOC complaint . . . requires us to identify precisely the 'unlawful employment practice' of which he complains.").

The Court notes that there are three letters relevant to the present analysis of Hamilton's retaliation claims. The Court addresses the letters in turn. (It cannot be disputed that the May 2002 EEOC charge is protected opposition—the only issue is whether some retaliatory act, e.g., a denial of overtime, etc., occurred after it was filed.)

    1.    May 2001 Letter

On May 13, 2001, Hamilton wrote a letter to Don Fox, Vice President of SSCo., complaining of harassment from Eugene Whisman and Jim Kotek, two white, male Setup/Operators. (Pl.'s St. ¶ 66.) The letter complains generally of what Hamilton perceives as harassment, without ever directly claiming that she felt that she was being discriminated against on the basis of her race or sex. Some parts of the letter suggest that the alleged harassment Hamilton complains of (by Whisman, for example) was also experienced by several of her co-workers, including male co-workers. (*See* Pl.'s Local Rule 56.1(b)(1) Affs. and Other Materials Referred to in Fed. R. Civ. P. 56(c) ("Pl.'s Materials") Ex. 13 (SSCO00017) at 1 ("Several other people have had trouble with Whisman, but they are afraid to say anything."); *id.* ("Mariano Capote [a Hispanic male] has had his moments with Whisman too.").) Other portions of the letter leave open the possibility that Hamilton is complaining of racial or sex-based harassment, at least with the benefit of hindsight. (*Id.* at 2 ("Why must they harass me and create a hostile work environment for me?") And still other portions of the letter perhaps suggest that Hamilton

16

did not consider, or at least had not come to the conclusion, that the alleged harassment was based on her sex and race. (*Id.* ("What is his motivation? I don't understand."); *id.* ("Why is this man acting this way? I don't understand what I have done to warrant this kind of behavior.").) In any event, after Hamilton sent this letter, Vaca asked her, on a daily basis over the course of a couple of weeks, whether she was going to transfer from Department 4 to Department 6. (Pl.'s St. ¶ 73.)

   2.  July 2001 Letter

   On July 4, 2001, Hamilton wrote a letter to Vaca, copied to Don Fox and Jim Yerhling, a Human Resource Department employee. (Pl.'s St. ¶ 74.) In that letter, Hamilton complained that Vaca had treated her less favorably than other employees. (*Id.*) The letter further expressed that Hamilton felt that this differential treatment stemmed from "Jose Duran [a Hispanic male] being a set-up man" and her promotion from set-up trainee, as well as her letter to Don Fox. (Pl.'s Materials, Ex. 14 (SSCO00020).)

   3.  January 2002 Letter

   On January 8, 2002, Hamilton wrote another letter to Vaca, and copied it to the Human Resources Department, regarding her impending transfer from Department 4 to Department 6. (Pl.'s St. ¶ 98.) In this letter, Hamilton wrote, among other things, that she is "the only black female in [D]epartment 4, and [she] understand[s] why [Whisman] and [Kotek] don't want me there." (*Id.* ¶ 99.) This letter also stated that Hamilton questioned Vaca's "motives because of [the upcoming transfer to Department 6]." (Pl.'s Materials, Ex. 14 (SSCO00037).) The letter also stated that Hamilton "knows" that "[Vaca] is not happy with the fact that [she had] involved Mr. Fox and Mr. Yehling in what is going on with [her] in [D]epartment 4." (*Id.*).

### 4.   The Court Assumes Statutorily Protected Opposition

The parties, and SSCo. in particular, do not advance meaningful arguments (or at least advance no arguments that frame the issue in the context of the relevant law) that these letters do or do not constitute statutorily protected opposition under Title VII. SSCo. does not argue that the substance of the May or July 2001 letters does not fall within Title VII's protections, and instead relies solely on its timeliness arguments. Having explained the reasons why SSCo.'s timeliness arguments must be rejected, the Court declines to construct substantive arguments regarding the sufficiency of the language in these letters on SSCo.'s behalf. The Court, therefore, assumes, but does not decide, that these letters, for purposes of resolving the instant motion, constitute "opposition" within the meaning of Title VII.

### 5.   There Is a Question of Fact Regarding Whether the Transfer Constituted an Adverse Employment Action

Defendants also argue that Hamilton cannot establish that she suffered an adverse employment action with respect to her retaliation claims. Specifically, Defendant contends that, with respect to her retaliatory transfer claim, Hamilton's "transfer from Department 4 to 6 does not constitute an adverse employment action because it did not result in any qualitative or quantitative change in the terms or conditions of [Hamilton's] employment." (D.E. 36 at 16.) Defendants argue that upon her transfer, neither Hamilton's job title, grade level, rate of pay, nor her primary job duties changed. Hamilton disputes SSCo.'s contention that her duties did not change. She admits that her job title, grade level, and rate of pay did not change (Defs.' St. ¶ 67)), but argues that her primary job duties "did change dramatically as a result of her transfer" (D.E. 41 at 16). In this regard, Hamilton argues that this transfer further reduced her training

opportunities because she was taken off the CNC lathe machines and "put back onto the CNC vertical machines." (*Id.*) Hamilton contends that transferring her to "Department 6, where her opportunity to train on the CNC lathes was further curtailed, constitutes an adverse employment action" for purposes of her retaliation claim. (*Id.* at 17.)

The Seventh Circuit has broadly defined the phrase "adverse employment action." *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 (7th Cir. 2001) (citing *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)). An adverse action, however, "must be materially adverse to be actionable, meaning more than a mere inconvenience or an alteration of job responsibilities." *Id.* Seventh Circuit precedent teaches that, "[b]ecause adverse actions can come in many shapes and sizes, it is important [for this Court] to consider the particular factual details of each situation when analyzing whether an adverse action is material." *Oest*, 240 F.3d at 613 (internal citations and quotations omitted). "[N]ot everything that makes an employee unhappy is an actionable adverse action" for purposes of Title VII. *Smart*, 89 F.3d at 441. In the retaliation context, a plaintiff must, at a minimum, "complain of some action on the employer's part that causes [the plaintiff] to suffer real harm." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 902 (7th Cir. 2003). The question of whether Hamilton's transfer (and alleged concomitant reduction in lathe machine training) is materially adverse (rather than neutral) is one of fact, and it can only be resolved on summary judgment if it cannot be fairly contested. *See Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 273-74 (7th Cir. 1996).

It is unlikely that Hamilton's transfer, without more (but there is potentially more, as discussed below), is an adverse employment action for purposes of Title VII. *See, e.g., Williams*, 85 F.3d at 274 ("Obviously a purely lateral transfer, that is, a transfer that does not involve a

demotion in form or substance, cannot rise to the level of a materially adverse employment action.") (emphasis omitted); *id.* ("A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either.") (collecting cases); *Crady v. Liberty Nat'l Bank and Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993). Hamilton admits that after the transfer her job title, pay rate, and job grade remained the same. (Defs.' St. ¶ 67.) But she disputes that her duties remained the same, and she argues that the transfer functionally and significantly reduced her CNC lathe machine training opportunities. (Plaintiff contends that this matters because her ability to get further promotions depended on her demonstrating proficiency on the lathes, a proposition SSCo. does not dispute.)

Authority that SSCo. indirectly relies upon recognizes that the denial of training can constitute an adverse employment action. *See Johnson-Carter v. B.D.O. Siedman, LLP*, 169 F. Supp. 2d 924, 938 (N.D. Ill. 2001) ("[W]e believe a significant pattern of denial of training . . . can constitute [an] adverse employment action[] . . . ."). The Court holds that there is, at a minimum, a question of fact regarding whether the transfer, under the particular facts of this case, constituted a materially adverse employment action, particularly in light of SSCo.'s admissions that one of the goals of a setup operator trainee is to learn to set up various types of machines (Pl.'s St. ¶ 15) and that a trainee could stay a trainee for years (as opposed to becoming a setup operator) if that trainee does not know how to setup different machines (*id.* ¶ 16). *See generally Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (teaching that a transfer, under particular circumstances, may constitute and adverse employment action for purposes of Title VII retaliation claim).

### 6. The Court Deems SSCo. to Have Abandoned the Argument That Peplow's, Guevara's, and Fonseco's Transfers Undercut Hamilton's Transfer Claim

Defendants also argue that with respect to her retaliatory transfer claim, Hamilton "cannot show that she was treated less favorably than other employees who did not engage in statutorily protected activity." (D.E. 36 at 17). Seventh Circuit precedent teaches that "to determine whether employees are similarly situated for the purposes of analyzing a Title VII retaliation claim, the employees must be directly comparable in all material respects." *Hudson*, 375 F.3d 561 (internal quotations and citation omitted). Specifically, SSCo. argues that "[t]hree other employees were transferred along with Plaintiff in the restructuring of Departments 4 and 6." (D.E. 36 at 17.) Specifically, Peggy Peplow ("Peplow"), Theresa Guevara ("Guevara"), and Maria Fonseco ("Fonseco") transferred departments. (Defs.' St. ¶ 55.) Hamilton responds by arguing that these individuals are not similarly situated because they were not Setup/Operator Trainees (D.E. 41 at 18), a point that SSCo. concedes (Pl.'s St. ¶ 102). SSCo. did not respond to this argument its reply; therefore, the Court considers this ground—i.e., the ground that Peplow's, Guevara's, and Fonseco's transfers somehow undercut an element of Hamilton's *prima facie* retaliation case—abandoned for summary judgment purposes.

### 7. Hamilton Has Identified a Triable Issue Regarding Whether the Reasons For Her Transfer Were Pretextual

Under the indirect method of proving a Title VII retaliation claim, assuming Hamilton can establish a *prima facie* case of retaliation, SSCo. must "articulate a non-invidious reason for the" transfer and alleged denial of overtime, the challenged actions at issue in this case. *Hudson*, 375 F.3d at 561 (citing *McDonnell Douglas*, 411 U.S. at 802). Hamilton "must then establish

that there is an issue of material fact as to whether [SSCo.'s] proffered reasons are merely pretext for . . . retaliation, in order to survive summary judgment." *Id.* Hamilton may establish pretext with evidence that SSCo. was "more likely than not motivated by a discriminatory reason or that [SSCo.'s] explanations are not worthy of credence, i.e., they are factually baseless, did not actually motivate [SSCo.], or were insufficient to motivate the adverse employment action." *O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002). As discussed below, SSCo. argues that even if Hamilton can make out a *prima facie* case for retaliatory transfer, SSCo. had three legitimate business reasons for transferring her.

SSCo. offers three non-retaliatory reasons for Hamilton's transfer, all of which apparently fall under the general heading "business conditions." First, SSCo. argues that it needed a first shift (the shift Hamilton worked on) Setup/Operator Trainee to work on the machine center in Department 6, and none of the other Setup/Operator Trainees in Department 4 on the first shift had machining center knowledge. (Defs.' St. ¶ 57.) Hamilton denies that she was the only first-shift-trainee with machine center knowledge in Department 4, arguing that at least two employees, Jose Duran and Capote, also had machine center knowledge.[13] (Pl.'s Resp. ¶ 57.) She contends that the "truthfulness of Vaca's contention that essentially Ms. Hamilton was the only choice for transfer is in question and at issue in this case, and for the fact-finder to resolve." (D.E. 41 at 19.) The citations to Vaca's deposition in Hamilton's 56.1 denials reveal that Vaca testified that at the time of Hamilton's transfer Duran may have had some, albeit limited machine center knowledge (Vaca Dep. at 129:1-7) and that Capote testified that he had "some" machine

---

[13]    Hamilton also alleges that Armando Borbon had machine center knowledge; however, even she conceded that he worked on the second shift, not the first shift. (Pl.'s Resp. ¶ 57.)

22

center knowledge, although it is unclear from his affidavit whether Capote obtained that knowledge before or after Hamilton's transfer (Capote Decl. ¶ 7). In his affidavit in further support, Vaca testified that Capote, at the time of Hamilton's transfer, did not have any experience on the machining centers. (Vaca Supp. Aff. ¶ 23.) He further testified that Duran actually worked on the second shift, not the first shift. (*Id.*)

Second, SSCo. argues (although this argument is underdeveloped) that Department 4 purchased a new machine that reduced the workload of the machine center in Department 4. (D.E. 36 at 17.) Presumably, SSCo. contends that it transferred Hamilton because not as many CNC vertical machine Setup/Operator Trainees were needed in Department 4. Hamilton does not respond to this statement in her opposition, although she does admit that a new machine was obtained that reduced the workload in Department 4 in November of 2001. (Pl.'s Resp. ¶ 58.) Third, SSCo. states that Vaca considered that Hamilton had requested a transfer out of Department 4 approximately one month prior to her actual transfer due to an incident with a co-worker, Don Johnson. (D.E. 36 at 17.)

Hamilton responds by arguing that Defendants are just now claiming that "business conditions" were the reason behind her transfer. (D.E. 41 at 18-19.) In support, Hamilton notes that, at the time of her transfer to Department 6, Vaca indicated that the reason for her transfer as "cross-training in center six." (Pl.'s St. ¶ 104.) She states that Vaca admitted that she already knew how to do the work on the machines that she would be assigned to in Department 6, and that Vaca had first told her that she would be training on the lathe machines in Department 6 only to tell her later that he never told her that she would be training on the lathes. Hamilton notes that she received an e-mail from Vaca on December 27, 2001, which indicated that she "would

be transferred to center 6 on 1/7/02 to run [the machining center] and lathes." (Pl.'s St. ¶ 109.) She further argues that a "fact-finder could easily conclude that Ms. Hamilton was not transferred to Department 6 for cross-training purposes at all, and that the employer's proffered reasons for the transfer are therefore pretextual." (D.E. 41 at 19.)

Although her argument is not entirely clear on this point, it appears that she is arguing that the "cross-training in center six" reason listed on her transfer form was a lie or at least there is a triable issue regarding whether it is a lie and, therefore, she has, at a minimum created a triable issue with respect to the three reasons SSCo. offered as non-retaliatory reasons for her transfer. Hamilton cites no caselaw to support this argument. The Court notes, however, that the Seventh Circuit has "held that when an employer gives one reason at the time of the adverse employment decision but later gives another which is unsupported by the documentary evidence, a jury could reasonably conclude that the new reason was a pretextual, after-the-fact justification." *O'Neal*, 293 F.3d at 1005-1006 (collecting cases). SSCo. responds to the "after-the-fact justification" argument by arguing that the "cross training" reason on the transfer record is not inconsistent with Vaca's deposition testimony that he transferred Hamilton due to business conditions. (D.E. 49 at 17.) SSCo. attempts to explain this possible discrepancy by arguing that Vaca testified at his deposition that it was the business conditions at the time of Hamilton's transfer that required that she cross-train on the machining centers in Department 6.

The Court cannot determine with certainty from the record presented to it whether the facially non-discriminatory reason SSCo. offers for Hamilton's transfer—i.e., "business conditions," is in fact consistent with the reason listed for Hamilton's transfer—i.e., "cross-training," or an "after-the-fact justification," which would make summary judgment

inappropriate. "Cross-training" in this case is apparently a unique term with a definition that is not self-evident. Hamilton apparently interprets it exclusively to mean that she would be working with the lathe machines in Department 6, an interpretation that is at least plausible, given Vaca's December 2001 e-mail to her. SSCo. gives it a much more expansive reading. There is, however, some support in the record for both interpretations. Accordingly, the Court denies summary on Hamilton's retaliatory transfer claim. What Vaca meant by "cross-training" is for the trier-of-fact to decide.

        8.    Retaliation in the Form of Denial of Overtime Claim

SSCo. does not argue that Hamilton cannot establish a *prima facie* case with respect to her retaliation in the form of denial of overtime claim. Instead SSCo. argues that Hamilton cannot establish pretext with respect to this claim, contending that, although Hamilton worked less overtime in 2002, so did the entire manufacturing division. The Court notes that Hamilton denied, without citing anything that supports such a denial, paragraph 37 of SSCo.'s statement of fact, which states that "the Vice President of Manufacturing implemented a division-wide reduction in overtime hours due to business conditions." (Defs.' St. ¶ 37.) If this paragraph had been properly supported, the Court would deem this assertion admitted in light of Hamilton's unsupported denial. But it is not clear to the Court that Defendants' citation supports the statement as required. In this regard, paragraph 37 points to an e-mail by Don Fox that reads, in its entirety, "[b]acklog is at an all time low . . . . why anyone is working OT is beyond me. See me to justify ANY OT." (D.E. 35, Ex. 10 (SSCO00213).) This e-mail, on its face, does not indicate that a division-wide reduction took place, although it suggests that Vaca had to get Fox's approval to justify overtime. (Defendants could have submitted an affidavit from Fox indicating

that a division-wide reduction in overtime took place, but they did not. Vaca's affidavit does not affirmatively state that such a reduction took place; rather, it characterizes the e-mail as implementing a division-wide reduction.)

Moreover, Hamilton has identified individuals who did receive more overtime than her, Swacha (Swacha worked 46 hours of overtime in 2002 while Hamilton worked 24 hours (Defs.' St. ¶ 38)) and Capote (Capote's overtime hours actually increased from 309.5 in the year 2000 to 362 in the year 2001 (*id.*), while Hamilton's decreased from 500 in the year 2000 to 262 in the year 2001 (*id.*)). SSCo. does not attempt to explain the discrepancies in the overtime hours vis-a-vis Hamilton during the supposed division-wide reduction in overtime. As a result of these open factual issues and inferences, the Court denies summary judgment in favor of SSCo. on Hamilton's retaliation in the form of denial of overtime claim.

V.     Equal Pay Act Claim

In Count IV of her Complaint, Hamilton alleges that SSCo. discriminated against her on the basis of her sex by paying her lower wages than her male co-workers for performing substantially the same work in violation of the Equal Pay Act. (Compl. ¶ 79.) Specifically, she alleges that male employees who have been promoted to Setup/Operator Trainee, and whom SSCo. had employed for the same or less amount of time than her, earned a higher base salary for performing substantially the same work. (Compl. ¶ 59.)

For Hamilton's Equal Pay Act claim to survive summary judgment she must establish a *prima facie* case. To do so, she must present evidence that "(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." *Cullen v. Ind. Univ. Bd. of*

*Trustees*, 338 F.3d 693, 698 (7th Cir. 2003) (quoting *Stopka v. Alliance of Am. Insurers*, 141

F.3d 681, 685 (7th Cir. 1998)). If Hamilton can establish a *prima facie* case, "the burden of

persuasion shifts to the employer to prove that the disparity is justified by one of four affirmative

defenses: (1) a merit system; (2) a seniority system; (3) a system which measures earnings by

quantity or quality of production; and (4) a differential based on any factor other than sex."

*Howard v. Lear Corp. EEDS and Interiors*, 234 F.3d 1002, 1004-1005 (7th Cir. 2000) (citing 29

U.S.C. § 206(d)(1)). SSCo. argues that Hamilton cannot establish any of the elements of her

*prima facie* case.

> A.  Hamilton Has Produced Sufficient Evidence to Establish the First Element of Her
>     *Prima Facie* Equal Pay Act Claim

SSCo. argues that Hamilton cannot establish the first element of her *prima facie* because

at least some female Setup/Operator Trainees earned more than a number of male Setup/Operator

Trainees. This argument assumes that because the base pay of Hamilton (and perhaps some

other female Setup/Operator Trainees) was more than that of some males, Hamilton cannot have

an Equal Pay Act claim as a matter of law. This assumption is fundamentally flawed. Plaintiff

has identified at least one male Set/Operator Trainee, Roger Robinson (whom SSCo. hired after

her, although this fact is not relevant to the analysis of this specific issue), who was compensated

at a higher base pay rate than she was.[14] This is enough to satisfy the first element of her *prima*

---

[14]    During the course of discovery in this matter, Hamilton identified several SSCo.
employees whom she believes received a higher base pay rate than her. These individuals are
Jose Duran, Jose Ferreyra, Mariano Capote, Roberto Aceves, Armando Borbon, Maria Calderon
(who is female), Elijah Crawley, Stanley Swacha, Viera Horton, and Roger Robinson. (Defs.' St.
¶ 28.) Each of these individuals are Setup/Operator Trainees. (*Id.* ¶ 29.) Aceves, Borbon,
Calderon, a female whose base pay is the second highest of any of the individuals Hamilton
identifies, Capote, and Robinson all had a higher base pay rate than Hamilton. (*Id.*)

*facie* case at least for an Equal Pay Act claim. *See, e.g., Cullen*, 338 F.3d at 698; *Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539, 547 (11th Cir. 1991) ("To establish a prima facie case an employee need only show discrimination in pay against an employee vis-a-vis one employee of the opposite sex.") (internal quotation and citation omitted); *Dunn v. United Airlines, Inc.*, No. 96-3689, 1998 WL 142400, at *4 (N.D. Ill. Mar. 24, 1998) (quoting *Mitchell*, 936 F.2d at 547).

SSCo.'s reliance on *Boriss v. Addison Farmers Insurance Co.*, No. 91-3144, 1993 WL 284331, (N.D. Ill. July 26, 1993), and *Gallagher v. Kleinwort Benson Government Securities, Inc.*, 698 F. Supp. 1401 (N.D. Ill. 1988), is misplaced. In *Gallagher*, which *Boriss* relies on, the court found that as to each specific male comparator, the plaintiff had not been compensated at a lower rate. *See Gallagher*, 698 F. Supp. at 1404 ("Gallagher has failed to present any evidence showing that the male traders with whom she compares herself with received greater wages than her own."). In addition, the Court does not read *Boriss* to hold, as SSCo. appears to suggest it does, that summary judgment was appropriate in that case because the defendant produced generic evidence that some female employees made more than some of their male counterparts. If SSCo.'s reading of *Boriss* were correct, an employer could pay one female employee performing a job higher than all other male employees performing that job and then discriminate with impunity against all the rest of its female employees who held the job. That cannot possibly be correct. The Court rejects SSCo.'s reading of *Boriss*. Moreover, if SSCo.'s reading of *Boriss* were correct, the Court would respectfully decline to follow it.

> B.  Hamilton Has Not Established the Second and Third Elements of Her Prima Facie Equal Pay Act Claim

SSCo. also argues that Plaintiff cannot establish the second and third elements of her *prima facie* case. Specifically, SSCo. contends that Plaintiff has not advanced evidence to create a triable issue regarding whether she was performing equal work requiring equal skill, effort, and responsibilities as her comparators, or that the work performed by her comparators was done under similar working conditions. The Court agrees.

Plaintiff appears to have misunderstood the burdens imposed by a summary judgment motion on litigants, as well as the method of discharging those burdens. (*See* D.E. 41 at 23 ("Defendants have not met *their* burden of showing an absence of a genuine issue of material fact.") (emphasis in original).) Although SSCo. does have the initial burden as the party moving for summary judgment, it may satisfy that burden by presenting evidence that demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law *or*, where Hamilton (the non-moving party) bears the burden of proof on a particular element at trial, by pointing out an absence of evidence to support that element of Hamilton's case, *see, e.g.*, *Celotex*, 477 U.S. at 323. Once SSCo. has met this burden, Hamilton cannot simply rest on the allegations or denials in her pleadings. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 at 324. Rather, she must "by affidavits or as otherwise provided for in [Rule 56], . . . set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex*, 477 at 324.

SSCo. has met its initial burden under Federal Rule of Civil Procedure 56 with respect to Hamilton's Equal Pay Act claim. Hamilton, however, has failed to discharge her burden, which burden was triggered by SSCo. by pointing out that Hamilton had no evidence to support the second and third elements of her *prima facie* case. In this regard, Hamilton herself concedes that

"the record may be underdeveloped on [her] Equal Pay Act claim." (D.E. 41. at 23.) Case law recognizes that "[t]he law of this circuit is well-settled that the plaintiff has 'the burden of proving the substantial equality' of the jobs at issue under the Equal Pay Act." *Irvine v. Am. Nat'l Bank and Trust Co. of Chicago*, Nos. 84-0417, 84-3159, 1991 WL 134182, at * 3 (N.D. Ill. July 12, 1991) (citing *Epstein v. Secretary, United States Dep't of the Treasury*, 739 F.2d 274, 277 (7th Cir. 1984)); *see also Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 923 (7th Cir. 2000). Specifically, Hamilton must establish, "based upon actual job performance and content—not job titles, classifications or descriptions" that the work she performed was substantially equal to that of her comparators. *Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 913 (7th Cir. 2002) (internal quotation omitted). In this regard, Hamilton's job would be considered substantially similar where her job and those of her comparators involved a common core of tasks or a significant portion of the jobs is identical. *Stopka*, 141 F.3d at 685 (citing *Fallon v. Illinois*, 882 F.2d 1206, 1209 (7th Cir. 1989) (internal quotations omitted).

Instead of pointing to such evidence regarding the equality of her job in relation to her comparators, however, Hamilton merely argues that "Defendants have introduced nothing to base their claim that the work performed by the different Setup/Operator Trainees . . . required unequal skill, effort, and responsibility." (D.E. 41 at 23.) It is not the Defendant's burden to produce such evidence. *See Epstein*, 739 F.2d at 278 ("Plaintiff would, it seems, have us infer equal work from the defendant's failure to prove otherwise. This line of argument ignores the elementary fact that the burden for proving the *prima facie* case is on the plaintiff.").[15]

---

[15]    The fact that the Court found sufficient evidence to create a triable issue of whether there are comparators for Plaintiff's failure-to-train claim does not create a triable issue for the Equal Pay Act claim on the record in this case. Even Plaintiff concedes that the record she has

Accordingly, the Court grants summary judgment in favor of SSCo. on Hamilton's Equal Pay

Act claim.[16]

VI.     Illinois Common Law Assault Claim Against Martinez

In Count VI of her Complaint, Hamilton asserts a common law assault claim against

Martinez. Illinois law defines civil assault as "'an intentional, unlawful offer of corporal injury

---

assembled on the Equal Pay Act claim "may be undeveloped" (D.E. 41 at 23), and her concession
is telling. Plaintiff offers no evidence concerning any number of aspects of the Setup/Operator
Trainees' actual "job performance and content" that might affect their respective pay rates.
*Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 913 (7th Cir. 2002). For example,
the record appears to strongly suggest that the various Setup/Operator Trainees focused their
work on different machines, and that Plaintiff, perhaps alone, specialized on the vertical
machines, whereas others specialized on the CNC lathes. No evidence is offered, either,
concerning whether these respective specialties required similar skills, effort, or responsibilities,
or involved work under similar working conditions. Plaintiff may, reading the evidentiary
conflicts and ambiguities in the record in her favor, have sufficiently created a triable issue of
whether there were comparators on her failure-to-train claim—largely because it is clear that
certain individuals were assigned to train her and colleagues on the CNC lathes as conditions
permitted, and at least some evidence supports the view that those individuals would train
Plaintiff's male Latino and white counterparts while ignoring and/or impeding her efforts to get
similar training. However, as explained, Plaintiff has failed to show a common core of tasks or
that a significant portion of her job is identical to her other proposed Equal Pay Act comparators.

[16]      SSCo. also argues that the evidence establishes that any disparity in base rate between
Hamilton and her comparators is not based on Hamilton's sex. (D.E. 36 at 20.) In this regard,
SSCo. points out, and Hamilton admits, that Aceves, Borbon, and Capote all began working at
SSCo. before (in some cases, long before) Hamilton did. (Defs.' St. ¶ 29.) Seventh Circuit
precedent teaches that experience is a permissible, nondiscriminatory reason for a disparity in
wages. *See Fallon v. State of Illinois*, 882 F.2d 1206, 1212 (7th Cir. 1989). In response to this
argument, Hamilton appears to take issue only with Robinson—the only male comparator that
she has identified who started after her hire date. SSCo. argues that Robinson "was a lateral hire
with extensive experience as a machinist." (D.E. 36 at 20.) Hamilton takes issue with
Robinson's alleged experience, asserting that SSCo. supports this statement with hearsay—i.e., a
resume that is cited in SSCo.'s statement of undisputed facts, and which is not accompanied by
affidavit support. Although the resume appears to support SSCo.'s position, Plaintiff's
evidentiary argument, although resting on a bit of a technicality, is correct. Accordingly, the
Court does not rely on SSCo.'s proffered resume evidence. Nonetheless, Aceves, Borbon, and
Capote do not appear to support Plaintiff's claim on the record presented, and but for the single
evidentiary foundation issue regarding Robinson, neither does Robinson.

by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented." *Yang v. Hardin*, 37 F.3d 282, 286 (7th Cir. 1994) (quoting *Parrish by Bowker v. Donahue*, 443 N.E.2d 786, 788 (Ill. App. Ct. 1982)). Martinez argues that Hamilton's state law assault claim "cannot survive summary judgment because the undisputed facts are that [Hamilton], alone, was operating the Wasino machine, and she does not know who programmed or setup the machine." (D.E. 49 at 19.) Martinez also argues that Hamilton has not produced "any evidence of intent to cause injury." (*Id.*)

Hamilton's assault claim boils down to the following: Martinez intentionally set into motion some event or series of events that caused the Wasino machine to crash. Evaluating the record in the light most favorable to Hamilton, the Court finds the following for purposes of resolving the instant motion. Martinez refused to train Hamilton and asked others not to train her. Martinez got the machine ready the morning it crashed, Hamilton was operating the Wasino machine at the time it crashed (Defs.' St. ¶ 116), and, according to Plaintiff, Martinez was standing right next to her when the machine crashed. Hamilton believes that Martinez was responsible for the machine crashing because he warmed it up, checked the parts, and told her that it was ready to go. (*Id.* ¶ 117.) She also believes that Martinez knew the machine was going to crash. (*Id.* ¶ 118), and Martinez admitted that a "bad program" could cause the Wasino machine to crash. This evidence, Hamilton contends, makes summary judgment inappropriate because "a factual dispute remains as to whether Martinez intentionally allowed Ms. Hamilton to operate the Wasino machine, knowing that it would crash." (D.E. 41 at 22.)

Assuming Martinez programmed the Wasino (there is probably a triable issue regarding

whether Martinez programmed it that morning—Martinez was a Setup/Operator and he told her that the Wasino was "ready"), and based on how the parties have framed the assault claim, the question is whether the circumstantial evidence that Hamilton points to creates a triable issue as to whether Martinez harbored the intent sufficient to establish liability for assault.

As a threshold matter, the Court notes that Seventh Circuit precedent teaches that summary judgment is used sparingly in the context of claims involving questions of intent. *See Alexander v. Erie Ins. Exch.*, 982 F.2d 1153, 1160 (7th Cir. 1993); *Sieber v. Wigdahl*, 704 F. Supp. 1519, 1523 (N.D. Ill. 1989). Case law suggests that "[s]ummary judgment is appropriate, however, even when issues of [intent] are involved, if in response to a properly supported motion for summary judgment, the non-movant offers no specific facts to show that there is a genuine issue for trial." *In re George's Comet Motorcars, Ltd.*, 100 B.R. 403, 405 (N.D. Ill. Bankr. 1989) (citing *Anderson*, 477 U.S. at 256). And additional Seventh Circuit precedent teaches that a "movant is entitled to summary judgment if the burden is on the nonmovant to establish the state of mind and the nonmovant has failed to come forward with even circumstantial evidence from which a jury could reasonably infer the relevant state of mind." *Corrugated Paper Prods., Inc. v. Longview Fibre Co.*, 868 F.2d 908, 914 (7th Cir. 1989). This is such a claim: the circumstantial evidence and the speculative beliefs that Hamilton have proffered do not create triable issues regarding the assault claim.

First, there is no evidence that Martinez intentionally programmed the Wasino machine to malfunction; in fact, Hamilton testified that she did not even know whether Martinez actually

programmed the machine. (Defs.' St. ¶ 119.)[17] In addition, Plaintiff admits that Plaintiff had successfully run a few parts through the machine before it crashed. (*Id.* ¶ 116.)

Similarly, there is no evidence that warrants an inference that Martinez intended to assault Hamilton. Plaintiff herself testified that Martinez was standing next to her when the machine malfunctioned (Pl.'s St. ¶ 150)—which is an exceedingly implausible place for Martinez to locate himself if, as Plaintiff's proposed theory would have it, Martinez had let loose a weapon on Plaintiff in the form of a manufacturing machine that would crash and then might harm those nearby by throwing out sharp parts that could cause serious physical injury. (*See* Compl. ¶ 55.) (It is worth noting that there is no evidence or even allegation that anyone actually was hurt in this incident, nor any evidence or allegation that anyone was *ever* hurt in any similar incident, or even that such a machine had *ever* thrown parts from it during this or any other crash at any time.)

In summary, Plaintiff may have evidence which, if credited, shows that Martinez may have chosen not to train Plaintiff well and even perhaps encouraged another person not to do so. However, it is a far leap (and one not supported by sufficient evidence or logic) to infer from such evidence that Martinez wanted to physically assault and harm Plaintiff through a secretly programmed manufacturing machine that would crash and potentially throw sharp parts out at him and her. The Court, therefore, grants summary judgment in favor of Martinez on Hamilton's assault claim.

---

[17]     Hamilton denies this statement of fact in her Local Rule 56.1 Response; however, the cited documents do not support her denial. The Court, therefore, deems it admitted.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. Plaintiff's motion to strike is granted, and Defendants' motion to strike is denied.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Dated: 9-27-04